IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:08cv108

| | |
|---|---|
| VITALITY ANTI-AGING CENTER AND MED SPA, LLC,<br>Plaintiff,<br><br>vs.<br><br>LA BELLA DONNA ADVANCED LASER MED-SPAS OF NORTH AMERICA, LLC, TRACEY M. BARE, THOMAS F. BARE, AND NANCY B. DESANTIS,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) **Preliminary Injunction** |

**THIS MATTER** is before the court on Plaintiff's Motion for a Preliminary and Permanent Injunction and Memorandum in support, filed August 8, 2008 (Documents #2-3), Defendant's Response, filed October 20, 2008 (Document #18), and Plaintiff's Reply to Response, filed October 30, 2008 (Document #20). In addition, both parties have submitted verified pleadings and extensive affidavits and exhibits supporting their claims. A preliminary injunction hearing was held before this court on January 15, 2009, and this matter is now ripe for disposition.

**FACTUAL BACKGROUND**

Plaintiff Vitality Anti-Aging Center and Med Spa, LLC (hereinafter "Vitality") and Defendant La Bella Donna Advanced Laser Med-Spas of America, LLC (hereinafter "La Bella Donna") are in the "medical spa" business in Hickory, North Carolina, offering services such as laser hair removal and various forms of skin care treatment. Defendants Tracey M. Bare (hereinafter "Tracey Bare") and Nancy DeSantis (hereinafter "DeSantis") are member-managers of La Bella Donna and work at

1

the spa.[1]  Defendant Thomas F. Bare (hereinafter "Tom Bare") is the husband of Tracey Bare.  He is a financial advisor who has provided (possibly informal) services to La Bella Donna, but he has no ownership interest in the company and is not a member-manager.  (Answer ¶60.)

This case arises from a dispute between Vitality and La Bella Donna over which party has the right to use the phrase "Where Health and Beauty Meet" (hereinafter "the Mark") in advertising and as a business slogan.  Vitality has used the Mark in print advertisements in a local newspaper and a local magazine, and Vitality has also featured the Mark on its website.  Likewise, La Bella Donna has used the Mark on its website and in advertisements in the same local newspaper and magazine.

Vitality claims to have created the Mark in March of 2006, and the company began doing business in April or May of the same year.  (Compl. ¶8, 14; McLaurin Affs.).  On April 12, 2006, Vitality first submitted the Mark for advertising to the <u>Hickory Daily Record</u>, and this advertisement was published on April 30, 2006.  (Compl. ¶17-18, Pl.'s Ex. 1).  Vitality also ran an advertisement using the Mark in <u>Sophie</u>, a local magazine, that was published in May 2006.  Since this time, Vitality has consistently used the Mark in newspaper and television advertisements, brochures, fliers, signage, direct mailing, on its website, in emails, and in answering the phone.  Vitality has spent more than $150,000 advertising the Mark.  In 2006 alone, Vitality placed more than forty-five advertisements in the local newspaper, and the Mark was featured in at least 90% of these ads.  In addition, Vitality has submitted numerous examples of its print advertisements to this court, and most if not all of these ads feature the Mark prominently and in the manner of a service mark.

---

[1]Tracey Bare is a registered nurse and DeSantis is La Bella Donna's office manager.

For their part, La Bella Donna and the other Defendants claim to have created the Mark independently of Vitality, during a strategy session held on April 15, 2006 for the purpose of developing a detailed business plan. (DeSantis Aff. ¶6, Def.'s Ex. 1). On April 23, 2006, Defendants distributed fliers around Hickory that contained the Mark. (DeSantis Aff. ¶8, Def.'s Ex. 2). On May 8, 2006, Defendants printed menus and price sheets that also featured the Mark. (DeSantis Aff. ¶9, Def's Ex. 3). Like Vitality, Defendants also placed ads in Sophie and the Hickory Daily Record that included the Mark. These ads ran on June 6, 2006 and June 11, 2006, respectively. (DeSantis Aff. ¶10, Def's Ex. 4). On June 1, 2006, La Bella Donna opened to the public.

On June 7, after seeing La Bella Donna's ad in Sophie, Grace McLaurin, the owner of Vitality, confronted Tracey Bare, Tom Bare, and DeSantis at La Bella Donna and accused the Defendants of stealing "her saying." After the confrontation between McLaurin and the Defendants, Tom Bare filed a service mark application that same day with the United States Patent and Trademark Office ("USPTO").[2] In this application, DeSantis certified May 31, 2006 as the date of first use in commerce of the Mark. However, Defendants submitted additional information to the USPTO at a later date, and based on this information the USPTO found April 23, 2006 to be the date of the company's first use of the Mark.

Vitality also made an attempt to register the Mark, as referenced in an email sent to Vitality from LegalZoom sometime after June 12, 2006 (Pl.'s Ex. 7) and as shown by correspondence from the USPTO dated November 14, 2006 (Def.'s Ex. C). However, perhaps owing to the earlier

---

[2]Although Vitality imputes sinister motives, Defendants assert that Tom Bare had come to La Bella Donna on June 7, 2006 for the specific purpose of registering La Bella Donna's service marks. Thus, Defendants claim that the timing of the registration was pure coincidence. (Answer ¶48.)

application submitted by La Bella Donna, Vitality abandoned its attempts to register the Mark. (See Def.'s Exs. A, C).

In August or September of 2006, Tom Bare visited Vitality's place of business and spoke with McLaurin. Tom Bare presented McLaurin with flowers, which he referred to as a "peace offering," and inquired about Vitality's advertising efforts. During their conversation, Tom Bare told McLaurin that La Bella Donna relied on word of mouth to create business and did not need to spend thousands of dollars per month on advertising.

The USPTO registered the Mark in La Bella Donna's name on February 5, 2008.[3] After filing for registration of the Mark on June 7, 2006, La Bella Donna had ceased using the Mark in print advertisements pending official registration. Similarly, La Bella Donna did not place the Mark on its website until after the Mark was registered. (Answer ¶67.) However, Defendants did continue to use the Mark on brochures and on the in-house menus that listed the services offered by La Bella Donna.

After completing the registration process, La Bella Donna sent Vitality a cease and desist letter on February 27, 2008. (Pl.'s Ex. 8.) La Bella Donna then placed the Mark on its website. (Compl. ¶71.) Vitality responded with its own cease and desist letter, and this litigation ensued. (Pl.'s Ex. 9.) Vitality now requests a preliminary injunction to prevent Defendants from using the Mark and further asserts claims for infringement under the Lanham Act and North Carolina law, as well as a claim for Unfair and Deceptive Trade Practices. Defendants have filed a counter-claim for

---

[3]Vitality argues that this registration is invalid because Tom Bare was not allowed to file for registration of the Mark on behalf of La Bella Donna. However, the instant decision is not affected by the legal status of the registration, and so the court will not resolve this issue at present.

4

violations of both the Lanham Act and the North Carolina common law of trademarks.

## ANALYSIS

A. Standard for Granting Preliminary Injunction

The entry of a preliminary injunction is governed by the four-part test set forth in Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189 (4th Cir. 1977), which requires a court to consider "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the request is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest." MicroStrategy Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001) (citing Blackwelder, 550 F.2d at 195-97). These factors are considered in order, and the burden is on the plaintiff to establish that each factor supports granting the injunction. Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991).

The first task for this court is to determine whether the plaintiff has made a "clear showing" of irreparable injury if the injunction is denied. Id. If the plaintiff succeeds in doing so, the court must then balance the likelihood of irreparable harm to the plaintiff if the injunction is not granted against the likelihood of irreparable harm to the defendant if the injunction is granted. Id. (citing Blackwelder, 550 F.2d at 195). If the balance of hardships tips decidedly in the plaintiff's favor, then it "will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair grounds for litigation." MicroStrategy, 245 F.3d at 339. The more the balance of hardships tips in favor of the plaintiff, the less proof is required as to likelihood of success. Direx, 952 F.2d at 817. However, "[a]s the balance tips away from the plaintiff, a stronger showing on the merits is required." Id. at 813 (quotation omitted). Thus, "if 'the plight of the defendant [is] not substantially different from the plight of the plaintiff[]' . . . then 'the

5

probability of success begins to assume real significance,' and interim relief is more likely to require a clear showing of a likelihood of success." Id. at 808 (quoting Blackwelder, 550 F.2d at 195n.3).

When the balance of hardships does not tip decidedly in favor of the plaintiff, establishing a likelihood of success in a service mark case requires the plaintiff to show "a very clear and strong case. Some courts have stated the maxim that in considering preliminary injunctive relief, 'to doubt is to deny.' That is, if there is doubt as to the probability of plaintiff's ultimate success on the merits, the preliminary injunction must be denied." Id. at 813 (quoting 2 McCarthy on Trademarks and Unfair Competition, § 30.16, at 485-86 (2d ed. 1980)); see also MicroStrategy, 245 F.3d at 340. The evidence presented by a plaintiff to support her case under these circumstances must be "clear and convincing." MicroStrategy, 245 F.3d at 340.

Finally, the plaintiff must also show that the public interest favors the granting of injunctive relief.

    B.  Application of Blackwelder Factors in the present case

        1.  Likelihood of Irreparable Harm to Plaintiff

In the instant case, Vitality has met its burden of establishing irreparable harm if the injunction is not granted. In cases involving service mark infringement, a presumption of irreparable injury is generally applied once the plaintiff has demonstrated a likelihood of confusion. Scotts Co. v. United Indus. Corp., 315 F.3d 264, 271, 273 (4th Cir. 2002). Vitality and Defendants agree that the use of the Mark by both Vitality and La Bella Donna is likely to cause confusion as to source. (Pl.'s Compl. ¶74, 79, 104; Def.'s Answer ¶74, 79, 104).

Despite this agreement, this court will briefly consider the issue further. District courts in this circuit must examine seven factors when determining whether a plaintiff has shown a likelihood of

6

confusion. These factors are "(1) the strength or distinctiveness of the plaintiff's mark, (2) the similarity of the two parties' marks, (3) the similarity of the goods and services the marks identify, (4) the similarity of the facilities the two parties use in their businesses, (5) the similarity of advertising used by the two parties, (6) the defendant's intent, and (7) actual confusion." Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc., 130 F.3d 88, 91 (4th Cir. 1997) (citation omitted). In the present case, almost all of these factors weigh in favor of a finding of a likelihood of confusion. The USPTO determined that the Mark was at least suggestive in allowing Defendants to register the Mark without proof of secondary meaning, and this finding should be given some deference. Id. at 92. Because the Mark "suggests rather than describes, some characteristic of the [services] to which it is applied and requires the consumer to exercise his imagination to reach a conclusion as to the nature of the [services]," this court agrees with the USPTO that this Mark is at least suggestive, and thus is a stronger Mark than if it was merely descriptive or generic. Synergistic Int'l, LLC v. Korman, 470 F.3d 162, 171 (4th Cir. 2006) (quoting Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984)).

In addition, the strength of the Mark is buttressed by the extensive advertising in the local market undertaken by Vitality in order to associate the Mark with Vitality's services in the minds of consumers. See Petro, 130 F.3d at 93 (noting that the "strength of a mark ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source"). Vitality has spent over $150,000 in the past two years in support of this goal, a considerable sum for a small, local business. As a result of these efforts, Vitality has succeeded in identifying itself with

7

the Mark in the minds of consumers in its market, as evidenced by third party affidavits submitted in support of Vitality's motion for preliminary injunction. (Pl.'s Exs. 4, 5).[4]

The second through fifth factors also indicate likelihood of confusion. The two Marks used by La Bella Donna and Vitality are identical. Both parties claim the right to use the Mark's words in normal font without any other particular characteristics. Similarly, both businesses use the Mark to identify a nearly identical set of "med-spa" services, both businesses utilize similar buildings only a few blocks apart, and both parties advertise in the same local periodicals. Although the evidence in this case indicates that both sides developed the Mark independently and provides no evidence of bad faith, the record also shows that the use of the Mark by both La Bella Donna and Vitality has created actual confusion in the minds of consumers.

As a result of all of these facts, Vitality has established a likelihood of confusion and is thus able to show irreparable injury if the preliminary injunction is refused.

2. Likelihood of Harm to Defendants

However, there is also a likelihood of harm to Defendants if the injunction is granted. La Bella Donna registered the Mark with the USPTO, has used the Mark for as long as Vitality, and has also spent approximately $5,000 advertising the Mark and printing the Mark on its service menus. To grant the injunction would deny La Bella Donna the benefits of its efforts to register the Mark, its expenses in advertising the Mark, and any goodwill that La Bella Donna has created in the Mark.

---

[4]The strength and distinctiveness of the Mark is undercut somewhat by evidence of the Mark's use by seven other businesses, which was presented by defense counsel at the preliminary injunction hearing. However, three of these uses occurred in Canada, another of the purported uses did not actually employ the Mark, only one of these uses was by a similar "med-spa" business, and the nearest use occurred in Tennessee. Thus, these examples are insufficient to negate the distinctiveness of the Mark in the present case.

Further, La Bella Donna would be required to spend approximately $5,000 to reprint its menus and flyers without the Mark.

        3. Balance of Hardships

The harm to Vitality if the injunction is denied exceeds the harm to Defendants if the injunction is granted. Vitality has spent over $150,000 during the past two years in a successful effort to associate the Mark with its services, and Vitality has used the Mark continuously and extensively. Vitality has provided evidence of customer confusion, thorough documentation of its advertising, and affidavits from non-interested persons demonstrating the strength of the Mark in the local market and the strong link between the Mark and Vitality in the minds of consumers. If confusion regarding the Mark is allowed to continue, Vitality will lose the goodwill and power of association created by its extensive advertising.

On the other hand, La Bella Donna has not relied as heavily on the Mark to promote its business. Although the Mark has been displayed continuously on La Bella Donna's spa menus, the Mark was not placed on La Bella Donna's website until recently and has been used only sporadically in La Bella Donna's print advertisements. Although La Bella Donna has expended some money on advertisements employing the Mark and other slogans, Tom Bare and DeSantis both admitted that La Bella Donna relies on word of mouth marketing to generate business and does not depend primarily on advertising. Furthermore, DeSantis testified that an injunction in Vitality's favor would cost La Bella Donna only $5,000 in damages.

For these reasons, the balance of hardships tips in favor of Vitality, but not decidedly so. Vitality has spent considerably more promoting the Mark, and Vitality relies more heavily on the Mark to create business than does La Bella Donna. However, La Bella Donna has also expended

effort and money to register and to advertise the Mark, and La Bella Donna also uses the Mark to promote its business. Although La Bella Donna's reliance on the Mark and investment in the Mark may be less than Vitality, if La Bella Donna is the legal owner of the Mark, La Bella Donna has an equal right to protect its interest. Thus, Vitality must be able to show a probability – and not the mere possibility – of success on the merits. See MicroStrategy, 245 F.3d at 340.

### 4. Likelihood of Success on the Merits

Vitality brings a claim under the Lanham Act, 15 U.S.C. § 1125(a), for false designation of origin and service mark infringement. Although Vitality has not registered its use of the Mark, § 43(a) of the Lanham Act, 15 U.S.C. § 1125, also protects qualifying unregistered trademarks and service marks. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992); MicroStrategy, 245 F.3d at 341. In order to prevail, Vitality must prove (1) ownership of a valid, protectable service mark and (2) a likelihood of consumer confusion caused by La Bella Donna's use of the Mark. Synergistic Int'l, 470 F.3d at 170 (citation omitted). For an unregistered mark to be protectable, "the mark must be used in commerce . . . and it must be distinctive." Int'l Bancorp, LLC v. Societe des Bains de Mer, 329 F.3d 359, 363 (4th Cir. 2003). As discussed above, there is a substantial likelihood of confusion in this case, and the Mark is distinct enough to warrant protection. Thus, the question presented by the instant case is which party first used the mark in commerce in a way sufficient to establish priority of ownership.

When rights are asserted in an unregistered service mark, "priority is determined by 'the first actual use of [the] mark in a genuine commercial transaction." Emergency One, Inc. v. Am. Fire Eagle Engine, Co., 332 F.3d 264, 267 (4th Cir. 2003) (quoting Allard Enters., Inc. v. Advanced Programming Res., Inc., 146 F.3d 350, 358 (6th Cir. 1998)). To satisfy the requirement of use in

commerce, "it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." Id. (citations omitted). For this reason, secret, undisclosed, or non-public use is insufficient to establish use in commerce and to secure ownership of a service mark. For ownership of a service mark to accrue, the mark must be "placed on the market." Allard, 146 F.3d at 358 (quotation omitted). Therefore, Defendants' creation of the Mark in a strategy session on April 15, 2006 and Vitality's submission of the Mark for publication in a newspaper ad on April 12, 2006 are insufficient to establish use and are irrelevant when determining ownership of the Mark.

In order to qualify as genuine commercial use, the use of the mark "must be deliberate and continuous, not sporadic, transitory, or casual." Larsen v. Terk Techs. Corp., 151 F.3d 140, 146 (4th Cir. 1998) (quoting La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1271-72 (2d Cir. 1974)); see also CBS, Inc. v. Logical Games, 719 F.2d 1237 (4th Cir. 1983) (holding that sale of 3,000 "Rubik's cubes," sending solicitation letters to prospective vendors, and advertising in only two magazines was not enough to establish rights in trade dress against subsequent user who sold 16,000,000 Rubik's cubes in an exclusive agreement with the foreign manufacturer); Philip Morris, Inc. v. Imperial Tobacco Co., 251 F. Supp. 362 (D. Va. 1965) (holding that shipments of cigarettes bearing the contested mark by defendant company prior to plaintiff's first use "were sporadic, casual and nominal in character and thus created no rights in [defendant]"), *aff'd*, 401 F.2d 179 (4th Cir. 1968). And although "mere advertising" is not enough to establish priority in a service mark, Int'l Bancorp, 329 F.3d at 364, sales are not always required. Commercially reasonable use made within a commercially reasonable time before sales commence is enough to establish priority if a party uses the mark "in a way sufficiently public to identify or distinguish the [services] in an

11

appropriate segment of the public mind as those of the adopter of the mark." Dep't. of Parks and Recreation v. Bazaar del Mundo, Inc., 448 F.3d 1118, 1126 (9th Cir. 2006) (quotation omitted); see also New England Duplicating Co. v. Mendes, 190 F.2d 415, 418 (1st Cir. 1951) (holding that sale of goods or services is not necessary to establish use of the mark); Md. Stadium Auth. v. Becker, 806 F. Supp. 1236, 1239 (D. Md. 1992) (holding that "[a]dvertising and promotion is sufficient to obtain rights in a mark as long as they occur within a commercially reasonable time prior to the actual rendition of service . . . and as long as the totality of acts creates association of the goods or services and the mark with the user thereof" (quotations omitted)), aff'd, 36 F.3d 1093 (4th Cir. 1994).

In the present case, La Bella Donna first used the Mark to publicly identify its services in fliers distributed to local businesses on April 23, 2006, while Vitality's first public use of the Mark did not occur until April 30, 2006, when Vitality's advertisement first appeared in a newspaper for public viewing. However, La Bella Donna's use of the Mark on April 23, 2006 was likely not sufficient to establish priority. Although the Mark was present on the fliers, it was printed in small font, given little prominence compared to the other text, and accompanied by several other slogans. As a result, this court is not convinced that the Mark as displayed on these fliers served the service mark function of identifying La Bella Donna as the source of the services advertised. See MicroStrategy, 245 F.3d at 341-42.

In any event, La Bella Donna's use of the Mark before February 2008 (when the Mark was placed on the company website and print advertising of the Mark resumed) appears too sporadic and casual to establish priority. Before the end of February 2008, and other than the initial distribution of the fliers containing the Mark, La Bella Donna used the Mark only in two print advertisements, both of which ran in June 2006. Although the Mark also appeared on in-house menus and brochures,

there is no evidence that these were distributed widely, and the Mark's presence on the menus is as unpronounced as on the fliers.

Furthermore, this casual use was insufficient to associate the Mark with La Bella Donna in the local market. The fliers bearing the Mark were not closely targeted to likely customers, but were instead placed in local businesses, thus lessening their impact. Although these fliers may have generated some initial response by telephone, there is no evidence that these inquiries resulted in any business for La Bella Donna or that the fliers made anything more than an ephemeral impression on local consumers. For instance, this exchange took place between DeSantis and Vitality's counsel, Mr. Rogers, at the preliminary injunction hearing:

> **Mr. Rogers**: Did anyone indicate how they knew you were in business when – *after the flyers were handed out*?
>
> **Ms. DeSantis**: Oh, we would ask how did you hear from us and they'd say from Hickory Family Practice. [the medical practice of DeSantis's husband]
>
> **Mr. Rogers**: Okay. Did they indicate they heard from you in any other place?
>
> **Ms. DeSantis**: Well, there was a big word of mouth. I have a very large circle of friends and so does Tracy [Bare] and so does Tom Bare and so does my husband and the word got out and we had people lined up out the door almost to the street when we opened.

(emphasis added). On other occasions, both DeSantis and Tom Bare stated that La Bella Donna did not depend on advertising to generate customers but instead relied on word of mouth. Given the paucity of advertisements and the minimal effect of the fliers, at this point La Bella Donna has not shown either continuous use of the Mark or use sufficient to associate the Mark with La Bella Donna in the mind of consumers.

This record contrasts sharply with the evidence presented by Vitality, which established

13

continuous use of the Mark from April 30, 2006 to the present and the association of the Mark with Vitality's services in the local market. Although greater volume of use would not allow a junior user to abrogate the rights of a senior user of a service mark, Vitality's use in this case, when compared with the use of La Bella Donna, demonstrates the distinction between genuine use of a mark and de minimis use. Since April 30, 2006, Vitality has spent more than $150,000 to conduct an extensive advertising campaign in diverse media which relies heavily on the Mark, and Vitality has consistently featured the Mark on its website. In almost all of these advertisements, Vitality has given the Mark prominence, so there can be no dispute that it is intended to identify the source of the services offered.

5. Public Interest

The public interest here is the interest in encouraging actual use of valuable service marks, protecting valid service mark rights, and avoiding confusion as to source. For this reason, the public interest supports the grant of a preliminary injunction in favor of a bona fide user of the Mark.

## CONCLUSION

Since Vitality has demonstrated a strong probability of success at trial,[5] Vitality's request for a preliminary injunction is **GRANTED**. Defendants are enjoined from all use of the Mark, including display of the Mark on La Bella Donna's menus and brochures. However, Vitality will be required to post a $5,000 bond to offset any damages to Defendants should they ultimately prevail.

---

[5]This is true even if La Bella Donna has validly registered the Mark and is thus entitled to a presumption of priority. See Emergency One, 322 F.3d at 268. Vitality has presented evidence sufficient to rebut this presumption clearly and convincingly.

Signed: February 11, 2009

Richard L. Voorhees
United States District Judge